1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
8                  AT TACOMA

9

WILD BAINBRIDGE, a non-profit
10  corporation,

11                  Plaintiff,                    CASE NO. C04-5054BHS

12      v.                                        ORDER DENYING PLAINTIFF'S
                                                  MOTION FOR SUMMARY
13                                                JUDGMENT AGAINST THE
MAINLANDER SERVICES                               ARMY CORPS OF ENGINEERS
14  CORPORATION, an Oregon corporation;           AND GRANTING THE CORPS'S
OIEN CONSTRUCTION, INC., a                        CROSS-MOTION FOR
15  Washington corporation; UNITED                SUMMARY JUDGMENT ON ALL
STATES ARMY CORPS OF                              CLAIMS AGAINST THE CORPS
16  ENGINEERS, a federal agency, et al.,          AND GRANTING PLAINTIFF'S
                                                  MOTION TO STRIKE
17
                   Defendants.
18

19

20          This matter comes before the Court on Plaintiff's Motion for Summary Judgment

21  Against the Army Corps of Engineers (Dkt. 39), the Corps's Cross-Motion for Summary

22
    Judgment on All Claims Against the Corps (Dkt. 50), and Plaintiff's Motion to Strike
23
    contained in the reply (Dkt. 53). The Court has considered the pleadings filed in support of
24

25  and in opposition to the motions and the remainder of the file herein.

26

    ORDER – 1

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 15, 1991, the United States Army Corps of Engineers ("Corps")  received a complaint regarding Joginder P. Singh's development activities on approximately 37 acres of land in a subdivision called Fort Ward Estates Division 3 on Bainbridge Island. *See* AR000334.[1] The Corps ultimately found that Mr. Singh had violated the Clean Water Act by filling and clearing wetlands without obtaining a permit. AR000040. The Corps inspected various lots and identified wetlands. Specifically, in lot 23, the Corps documented a right-triangle-shaped wetland with a height of 80 feet and a length of 65 feet. AR000299; AR000300-301. This wetland has been referred to as "Wetland X." The Corps calculated the area of Wetland X by multiplying the height and length but erroneously neglected to divide the rectangular area in half to reach the area of the triangle. *See* AR000299. As a result, the recorded area of Wetland X was .12 acres when the actual area was .06 acres. *See id.*

The Corps investigator's field sketch from this time period concludes that the "total wetland fill" was less than 2.33 acres. AR000299. This figure represents the sum of three shaded areas: 1.59 acres labeled "wetland land clearing," .62 acres labeled "wetland fill," and .12 acres (Wetland X) labeled "wetland land clearing." *Id.* Other evidence in the record clarifies that Wetland X was not filled and was not deemed part of the total wetland fill. *See* AR000275 (Corps cease and desist letter identifying .62 acres of wetland fill and 1.71 acres of wetland clearing); AR000297 (Corps investigation report identifying same).

---

[1]In references to the administrative record, the Court cites the six-digit document identification numbers of documents in the certified administrative record as "AR######."

ORDER – 2

In 1992, the Corps requested that Mr. Singh remove debris on lot 23. AR000190; AR000206. Mr. Singh agreed to allow the cleared areas (the .12 acre and 1.59 acre sections) to return to their native state and that he could retain the .62 acre filled area. AR000045. With the approval of the Corps, removal of the debris was deferred. AR000188-89. There is no confirmation that Mr. Singh ever removed the debris. AR000010.

On August 13, 2001, the Corps conducted a site visit of lot 23 in response to a citizen complaint lodged by a member of Wild Bainbridge. During the investigation, the Corps discovered that the lot had been filled and leveled in preparation for construction of a house. AR000132. As part of its investigation, the Corps inspector dug three test pits along the perimeter of a triangular area to identify whether wetlands previously existed there but did not dig any test pits in the interior of the triangle. AR000096. The three data points formed a right triangle. *Id.* The Corps investigator who inspected the site drew a field sketch roughly twice the size of the right triangle formed by the three data points. *Id.* The left half of the sketch contains no data points. *Id.* The height of the triangle is 100 feet, and the width is 120 feet. *Id.* The sketch appears to be merely an estimate of Mainlander's fill because the Corps investigator considered both the size of the wetland and the portion of the wetland potentially impacted by the fill to be "unknown." AR000131. By one account, Wetland X was no longer evident in October of 2001. AR000056.

The Corps discovered that the lot was owned by Defendant Mainlander Services Corp. ("Mainlander"). AR000095. On October 24, 2001, the Corps sent a compliance letter

ORDER – 3

to Mainlander indicating that approximately .10 acres of wetlands had been filled without first obtaining the requisite authorization under the Clean Water Act. AR000092-93.

On July 5, 2002, the Corps notified Mainlander that it had filled .12 acres of wetlands without a permit. AR000069. The Corps explained that .10 acres could be authorized through an after-the-fact permit if .02 acres of fill were removed. *Id.*

On November 26, 2002, the Corps again wrote to Mainlander regarding the unauthorized filling of wetlands and asking the company to choose a course of action. AR000015.

On August 19, 2003, the Corps concluded that Mainlander's development activities likely only filled approximately .10 acres of wetlands because removal of Mr. Singh's previous fill (consisting of land clearing debris) had never been confirmed. AR000010.

On September 17, 2003, the Corps sent another letter to Mainlander stating that Mainlander's discharges could be authorized through an after-the-fact permit, that the project would still be required to adhere to Nationwide Permit ("NWP") requirements, and that Mainlander would still be required to obtain any required state or local permits. AR000001-02.

## II. STATUTORY SCHEME

The goal of the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this goal, the CWA prohibits the discharge of pollutants into navigable waters unless otherwise authorized under the CWA. 33 U.S.C. §§ 1311(a),

ORDER – 4

1344. Corps regulations define "fill material" as "material placed in waters of the United

States where the material has the effect of: (i) Replacing any portion of a water of the United

States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the

United States." 33 C.F.R. § 323.2(e). The term "dredged material" is defined as "material

that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). A

"discharge" of dredged or fill material occurs when dredged material is added into the

waters of the United States. 33 C.F.R. § 323.2(d). "Navigable waters" are defined by the

Clean Water Act as "the waters of the United States." 33 U.S.C. § 1362(7). By regulation,

the term encompasses "wetlands," which are themselves broadly defined. *See* 33 C.F.R. §

328.3(a), (b).

Congress has charged the Corps with regulation of the discharge of dredged or fill

material into navigable waters. *Resource Investments, Inc. v. U.S. Army Corps of Engineers*,

151 F.3d 1162, 1166 (9th Cir. 1998). Section 404 of the CWA prohibits the discharge of

"dredged or fill material" into navigable waters without a permit issued by the Corps. *See* 33

U.S.C. § 1344.

The Corps may issue both individual and general permits. *See* 33 U.S.C. 1344(a), (e).

Each disposal site for which the Corps issues an individual permit must be specified in

accordance with guidelines developed by the Administrator of the Environmental Protection

Agency in conjunction with the Corps. 33 U.S.C. § 1344(b). Individual permits are

processed on a case-by-case basis. Evaluation of an individual permit application requires

completion of a multi-step examination process. *See* 40 C.F.R. § 230.5. An individual

ORDER – 5

permit will not be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact." 40 C.F.R. § 230.10(a).

General permits are issued on "a State, regional, or nationwide basis." 33 U.S.C. § 1344(e). A general permit may be issued only "if the Secretary determines that the activities in [any category of activities involving discharges of dredged or fill material] are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

The Corps's NWP program is "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.l(b). NWPs must meet the guidelines issued by the Environmental Protection Agency in consultation with the Corps under CWA Section 404(b)(1), 33 U.S.C. 1344(b)(1). *See* 33 U.S.C. 1344(e)(1). These "404(b)(1) Guidelines," codified at 40 C.F.R. Part 230, establish criteria designed to ensure that permits issued by the Corps protect the environment to the greatest extent practicable. *See* 40 C.F.R. §§ 230.1, 230.2. The Corps applies the 404(b)(1) Guidelines for each category of activities at the time it promulgates NWPs. Therefore, if an NWP applies, "the applicant needs merely to comply with its terms, and no further action by the [Corps] is necessary." 40 C.F.R. § 230.5(b).

Activities falling within the scope of an NWP are automatically authorized without an individualized inquiry, although advance notification, known as preconstruction notification, is required in some cases. 33 C.F.R. § 330.1(e). If preconstruction notification

ORDER – 6

is required, the Corps will verify the applicability of the NWP to the proposed activity. 33 C.F.R. § 330.1(e)(2). If preconstruction notification is not required, the Corps may nevertheless exercise "discretionary authority" to restrict the otherwise automatic application of the NWP program. 33 C.F.R. § 330.1(d).

In this case, the NWP at issue is NWP 18. NWP 18 permits minor discharges of dredged or fill material if certain criteria are satisfied. AR000466. One such condition requires that the discharge cause the loss of no more than .10 acres of wetland. *Id.* Advance notification is only required for discharges in special sites, including wetlands. *Id.* If the Corps issues the requisite verification or fails to respond within 45 days, the discharge may proceed under the authorization of NWP 18. AR000526-27.

If the Corps discovers an unauthorized discharge of dredged or fill materials into waters of the United States, the Corps should notify the responsible parties and, if the project is ongoing, issue a cease and desist letter. 33 C.F.R. § 326.3(c).  Such violations may be resolved through issuance of an after-the-fact permit if the activity could have been authorized through issuance of a general or individual permit. 33 C.F.R. § 326.3(e).

### III. STANDARD OF REVIEW

The standard of review for an agency's determination to issue a Section 404 permit under the CWA is found in the Administrative Procedures Act, which provides that a reviewing court shall set aside only agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830-31 (9th Cir. 1986). An agency's decision is

ORDER – 7

arbitrary and capricious if the agency "relied on factors which Congress has not intended it

to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43

(1983).

The scope of review under the arbitrary and capricious standard is "highly

deferential," narrow, and limited to determining whether the decision is based upon a

consideration of the relevant factors and is not a clear error of judgment. *Id.*; *Hintz*, 800 F.2d

at 831. The agency must articulate a satisfactory explanation for its action based upon an

examination of the relevant data, and the reviewing court will not substitute its judgment for

that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. The reviewing

court will "uphold a decision of less than ideal clarity if the agency's path may reasonably

be discerned" but should not "supply a reasoned basis for the agency's action that the

agency itself has not given." *Id*. The reviewing court may not set aside the decision of the

Corps unless there is no rational basis for the action in the record. *Hintz*, 800 F.2d at 831.

**IV. DISCUSSION**

**A.   MOTION TO STRIKE**

In support of the Corps's opposition and cross motion, the Corps offers two

declarations. *See* Dkt. 50 at 3. The Corps contends that consideration of these materials is

appropriate to "explain the documents in the administrative record" and "a patent error

ORDER – 8

evident" in the administrative record. *Id.* Wild Bainbridge moves to strike this evidence. Dkt. 53 at 3.

Principles of administrative law allow consideration of supplemental materials if (1) the materials are necessary to determine whether the agency considered all relevant factors and sufficiently explained its decision; (2) the agency relied on documents or materials not included in the record; (3) the materials are necessary to explain technical terms or complex subject matter involved in the agency action; or (4) a strong showing of agency bad faith is made. *See Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703-04 (9th Cir. 1996). Moreover, the Supreme Court has recognized that where "further explanation is necessary to a proper assessment of the agency's decision" because "there was such failure to explain administrative action as to frustrate effective judicial review," the Court may review affidavits, testimony, or additional explanation as necessary. *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973).

Wild Bainbridge first contends that the evidence should be stricken because the Corps did not move to supplement the record or otherwise make a formal request. Dkt. 53 at 3. Wild Bainbridge cites *U.S. v. W.R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007), for the proposition that a formal request is necessary. In *W.R. Grace*, the Ninth Circuit granted a motion to strike items not included in the administrative record. *W.R. Grace*, 504 F.3d at 766. The Ninth Circuit held that "the appropriate manner to supplement the record *on appeal* is 'by motion or formal request so that the court and opposing counsel are properly apprised of the status of the documents in question.'" *Id.* (emphasis added). The court held

ORDER – 9

that its ruling as to supplementation of the record on appeal "does not preclude application to the district court for inclusion in the district court's record for whatever use is appropriate." *Id.* In the Corps's opening brief, the Corps requested consideration of extra-record materials and provided those materials to the Court. *See* Dkt. 50 at 13. This request was sufficient to apprise Wild Bainbridge of the request and the nature of the documents to be considered. The Court therefore concludes that the request to consider extra-record materials is properly before the Court.

Wild Bainbridge also contends that the Corps should not be permitted to supplement the record to provide a rationale for its decision that is based on hindsight or to include new evidence. Dkt. 53 at 5. The materials proffered by the Corps seek to explain the evidentiary underpinnings of the Corps's decision. The materials seek to clarify a glaring error that is plainly evident from the record itself: Wetland X was miscalculated in 1991 due to a simple mathematical error. The extra-record materials are therefore not necessary to determine whether the Corps considered the true area of Wetland X and have not been considered**.**

**B.     FAILURE TO REQUIRE PRECONSTRUCTION NOTIFICATION**

Wild Bainbridge contends that the Corps acted arbitrarily and capriciously by concluding that Mainlander's activities fit the requirements of NWP 18 without requiring Mainlander to provide a preconstruction notification. Dkt. 39 at 14. Wild Bainbridge's contentions are circular and unreasonable. Put simply, Wild Bainbridge contends that an after-the-fact permit may issue only if all requirements for a nationwide permit are satisfied, including the general condition requiring preconstruction notification. Dkt. 53 at 18. Such a

ORDER – 10

reading of the statutory framework would undermine the use of after-the-fact permits to cure what would otherwise be a violation of the CWA. *See* 33 C.F.R. § 330.6(e) ("These authorizations often play an important part in the resolution of violations."). To require that no violation occur before an after-the-fact permit may be utilized to cure the violation is circular and a reading that does not appear consistent with the CWA. Moreover, to the extent that Wild Bainbridge would require submission of a post-construction notification, Wild Bainbridge offers no statutory or regulatory basis for such a requirement. Finally, the Corps's interpretation of its regulations as imposing no such requirement is entitled to substantial deference. *See Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994).

## C.   APPLICABILITY OF NWP 18

Wild Bainbridge also contends that Mainlander's activities do not fall within NWP 18 and that the Corps was arbitrary and capricious in deciding otherwise. Dkt. 39 at 10-14. Specifically, Wild Bainbridge contends that Mainlander's fill of Wetland X measured .14 acres and therefore did not fall within NWP 18.

Wild Bainbridge contends that the Corps's 1991 measurements reflected the extent of the wetland clearing and not the size of the wetland itself. Dkt. 53 at 13. The 1991 field sketch is based on several data points, some of which turned out not to be wetlands, as indicated in the drawing and the accompanying documentation. AR000299 (drawing); AR000302 (test pit B-1 deemed not to be a wetland); AR000303 (test pit B-2 deemed not to be a wetland); AR000307 (test pit B-6 deemed not to be a wetland). Because the Corps's data were not limited to the wetland clearing itself, it was not arbitrary and capricious for the

ORDER – 11

Corps to later conclude that 1991 measurement reflected the size of Wetland X and not merely the extent of the wetland clearing.

Wild Bainbridge also contends that reliance in 2003 on the 1991 sketch was arbitrary and capricious and that the Corps should have conducted a wetland delineation to determine whether Wetland X had changed in size. Dkt. 53 at 15. The fact that Wetland X may have increased, or decreased, in size is not a sufficient basis to deem the Corps's actions unlawful. When coupled with the account that Wetland X was no longer evident in 2001 and the Corps's determination that the area where Wetland X had been located was covered with fill (AR000008), the Corps's reliance on the 1991 data is not arbitrary and capricious.

Finally, Wild Bainbridge contends that the pile of debris in Wetland X, which was apparently attributable to Mr. Singh and never removed, does not constitute a sufficient amount of fill to conclude that Mainlander was responsible for no more than .10 acres of fill. Dkt. 53 at 14. Wild Bainbridge essentially asks the Court to review pictures of the debris pile, estimate the size of the pile, and render a decision based on such an estimation. *See* AR000315. This the Court will not do.

Wild Bainbridge contends that the 2001 field sketch is the most important piece of evidence for determining the size of Mainlander's wetland fill. Dkt. 53 at 16. Wild Bainbridge has calculated the area of the 2001 field sketch at .14 acres. *Id.* Even more important than the sketch, however, is the data reflected in the sketch. The 2001 field sketch includes only three data points, which form a triangle. Wild Bainbridge does not allege or demonstrate that the area inside of the three data points totals more than .10 acres.

ORDER – 12

Therefore, the only *data* from 2001 indicate that the size of Mainlander's wetland fill was less than .10 acres. The Court therefore concludes that the Corps's issuance of an after-the-fact NWP 18 to resolve Mainlander's CWA violation was not arbitrary and capricious.

## D.    REMAINING CLAIMS

Wild Bainbridge concedes that it did not seek summary judgment against the Corps on all claims asserted in the complaint. *See* Dkt. 53 at 19-23. Pursuant to the parties' agreement that all claims against the federal defendants will be resolved by summary judgment, all claims not raised in Wild Bainbridge's summary judgment motion are dismissed as to the Corps. *See*  Dkt. 30 at 2.

## V. ORDER

Therefore, it is hereby

**ORDERED** that Plaintiff's Motion for Summary Judgment Against the Army Corps of Engineers (Dkt. 39) is **DENIED**, the Corps's Cross-Motion for Summary Judgment on All Claims Against the Corps (Dkt. 50)  is **GRANTED**, Plaintiff's Motion to Strike contained in the reply  (Dkt. 53) is **GRANTED**, and Plaintiff's claims against the U.S. Army Corps of Engineers are **DISMISSED**.

DATED this 26th day of February, 2008.


_____
BENJAMIN H. SETTLE
United States District Judge

ORDER – 13